IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                              Case No. 16-CR-10050-JTM

BLAKE D. WHITE,

    Defendant.

**MEMORANDUM AND ORDER**

The indictment charges defendant Blake D. White with knowingly possessing a firearm while being a person subject to a domestic violence court restraining order, in violation of 18 U.S.C. § 922(g)(8). White moves to suppress the gun, alleging it was seized without "reasonable suspicion" that criminal activity was afoot in violation of his Fourth Amendment rights (Dkts. 27 and 32). He argues that an anonymous tip that a person is carrying a gun is insufficient to justify a police officer's stop and frisk of that person, especially when the laws of the state permit its citizens to carry firearms. The court heard evidence relating to White's motion on October 3, 2016, and for the reasons stated in this Order, grants the motion.

**I.    Factual Background**

On March 9, 2016, an anonymous caller (later identified as Jonathan Corp) called 911 and reported that he just left Home Mart, a store in Lyons, Kansas, and saw a guy that "looked a little sketchy" and possibly "tweeking out," with "a gun sticking out of his pants." Govt. Ex. 1A. He did not know that person's intention but suggested a "welfare check" on the store clerk. *Id.* He described the guy as: white, dirty-looking, brown jacket, brown hair, black or red hat, 5'10"

1

or 5'11", between 170 to 180 pounds, in his late twenties to early thirties, driving a white Blazer. *Id.*

911 dispatched Lt. Hammer to Home Mart. The dispatcher told Lt. Hammer that she had "a report of an individual with a weapon at Home Mart. RP [reporting party] advises it's a white male, 5'10" or 5'11", possibly late 20's early 30's, RP said he was very dirty looking and just looked suspicious." Govt. Ex. 1B. Lt. Hammer asked whether the suspect had used the weapon in any way, had he brandished it or was it holstered, and the dispatcher said, "[RP] advised that it looked like he was hiding it beneath his coat[,] he's wearing a brown jacket[,] he only saw it when the subject had moved the coat and it was in his pants." *Id.*

Lt. Hammer arrived at Home Mart within minutes of the call. He ran a license plate check on the white vehicle, which came up "clean" and owned by Valerie Navarro, defendant's wife. Lt. Hammer knew Navarro as she was formerly engaged to his stepson. Lt. Hammer testified that his stepson had had firearms and drug problems, and had recently taken his own life. His stepson's problems, however, has no bearings as to White.

Upon entering the store, Lt. Hammer directed two patrons to leave the store and a female store clerk to stay behind a wall. He passed Navarro as he moved through the store aisles and then approached White, who was talking to a male store clerk about some stereo speakers. He immediately told White to put his hands up and White complied. He then asked White if he had a firearm and White responded yes. He removed the firearm from the back of White's waistband, patted him down, and removed a magazine as well. He then asked for identification and White pulled out his driver's license from his wallet. Lt. Hammer asked dispatch to run White's license; dispatch advised that White's license was suspended. He then asked dispatch to run Kansas criminal history on White and check the gun's serial number. At some point during the records

check, Rice County Sheriff's Deputy Shrag arrived and stationed himself near White to block him from leaving.

Dispatch advised the gun was clean and there was no record of a conceal carry license.[1] As for criminal history, the following discussion occurred:

> Dispatcher: Well[,] he's got several domestics. Violence charges (sic). I'm trying to find his most recent stuff. He's got quite a list. Looks like a lot of it is driving while suspended, failure to appear. I thought I saw two domestic violence. Uhm . . . . Nothing that indicates anything about a weapon.
>
> Lt. Hammer: Ok, no felonies, just domestics?
>
> Dispatcher: Yea
>
> Lt. Hammer: How long ago was the domestic?
>
> Dispatcher: Um . . . it was 2013.
>
> Lt. Hammer: Ok. Ok. Alright, I will go from there then. Just save that for me, ok?
>
> Dispatcher: Ok.

*Id.* at 4. Lt. Hammer then told White that he would hold the gun for further investigation and allowed White to leave. Lt. Hammer called dispatch to report the call was over, and asked, "Can you also run Triple I on the subject, I have that item in my possession until tomorrow, until I can figure out some more on it?" *Id.* at 5. The dispatcher asked for the reason and he answered, "I need that reference questionable on the domestic and the conceal carry. I'm not sure what we need to place it under . . . ." *Id.*

Later that evening or the following day, Lt. Hammer tracked down the 911 caller and asked for a written statement. He also contacted White's ex-wife, got details regarding the domestic violence charges from her, and obtained a copy of the domestic court order (the

---

[1] Kansas gun law changed in July 2015. Although Kan. Stat. Ann. § 75-7c03(a) references a license to carry concealed handguns, it further states that "[t]he availability of licenses to carry concealed handguns . . . shall not be construed to impose a general prohibition on the carrying of handguns without such license, whether carried openly or concealed, or loaded or unloaded."

"PFS"), which indicated that White was not allowed to possess a firearm. The parties do not dispute the PFS was effective on the subject date.

## II. Legal Standard

The government bears the burden of proof regarding the validity of a warrantless seizure. *See Florida v. Royer*, 460 U.S. 491, 500 (1983); *United States v. Herrera*, 444 F.3d 1238, 1242 (10th Cir. 2006). In this case, the government contends defendant's initial seizure was an investigative detention permitted under *Terry v. Ohio*, 392 U.S. 1 (1968). To determine whether such a detention was constitutionally permitted, courts ask both "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 20. "A law enforcement officer may stop and briefly detain a person for investigative purposes 'if the officer has a reasonable suspicion . . . that criminal activity may be afoot.' " *United States v. Soto–Cervantes*, 138 F.3d 1319, 1322 (10th Cir. 1998) (*quoting United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

"An investigatory detention is justified at its inception if the specific and articulable facts and rational inferences drawn from those facts give rise to a reasonable suspicion a person has or is committing a crime." *United States v. McHugh*, 639 F.3d 1250, 1255 (10th Cir.), *cert. denied*, 132 S.Ct. 278 (2011) (internal quotations omitted). "Whether an investigative detention is supported by an objectively reasonable suspicion of illegal activity does not depend on any one factor but on the totality of the circumstances." *Soto–Cervantes*, 138 F.3d at 1322 (internal quotation omitted); *see also United States v. Conner*, 699 F.3d 1225, 1228 (10th Cir.2012); *McHugh*, 639 F.3d at 1256. The Supreme Court has emphasized that reviewing courts must look at the totality of circumstances "to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing. This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the

cumulative information available to them that might well elude an untrained person." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotations and citations omitted). Further, a determination that reasonable suspicion exists "need not rule out the possibility of innocent conduct." *Id.* at 277; *Conner*, 699 F.3d at 1228. "Reasonable suspicion requires only 'some minimal level of objective justification.'" *Conner*, 699 F.3d at 1228 (*quoting Sokolow*, 490 U.S. at 7).

### III. Analysis

The government contends that Lt. Hammer's encounter with White was a permissible investigatory detention under *Terry* because: 1) a 911 caller reported seeing defendant with a gun in his waistband and had concerns that defendant might harm the store clerk at Home Mart; and 2) Lt. Hammer saw a bulge in defendant's waistband when he approached defendant. The government further contends that the police are allowed to temporarily seize a firearm when they find it during a *Terry* stop and frisk, citing *U.S. v. Thomson*, 354 F.3d 1197 (10th Cir. 2003).[2] The court finds the government's arguments unavailing here.

As an initial matter, the court finds the 911 call reliable.[3] The court also finds no fault with the police dispatching an officer in response to the 911 call. Indeed, the police acted responsibly by doing so, taking a proactive rather than a reactive stance.

---

[2] *Thomson* is factually distinguishable and thus, inapposite. In *Thomson*, the defendant's former coworkers reported that he was currently cleaning out his desk after being terminated, was known to carry a gun, and had previously made threats to shoot up the workplace.

[3] White argues that the 911 call was not sufficiently reliable to justify a *Terry* stop. Courts consider five non-exclusive factors in determining whether a 911 call possesses sufficient indicia of reliability: 1) whether the informant lacked true anonymity; 2) whether the informant reported contemporaneous, firsthand knowledge; 3) whether the informant provided detailed information about the events observed; 4) the informant's stated motivation for reporting the information; and 5) whether the police corroborated information provided by the informant. *United States v. Williams*, 646 F. App'x 624, 627 (10th Cir. 2016). Here, all five factors indicate the 911 call possessed the requisite indicia of reliability. Although the caller did not leave his name, he called from a phone number that made him easily identifiable to the police. The caller had just left Home Mart, reported his own observations, and indicated his motivation was concern for the safety of others. Finally, the police corroborated the caller's information – white male, matching description, with a gun.

The court agrees with the government that there is nothing improper about Lt. Hammer approaching defendant and asking him whether he had a gun. But Lt. Hammer did more than that. When Lt. Hammer first approached defendant, he immediately instructed defendant to put his hands up. As soon as he did that, Lt. Hammer seized defendant. *See United States v. King*, 990 F.2d 1552, 1559 (10th Cir. 1993) (officer violated Fourth amendment when she initiated what was essentially an arrest procedure by ordering defendant to get out of his car with his hands up after she approached his vehicle to divert traffic at the scene of an accident and saw a gun on the defendant's passenger seat; officer's failure to use less intrusive means to ensure her safety was unreasonable).

At this point, Lt. Hammer had no articulable reasonable suspicion that defendant had or was committing a crime. Lt. Hammer simply suspected that defendant had a gun. But in Kansas, citizens may carry firearms, openly or concealed. Lt. Hammer testified that he thought it was suspicious that defendant carried the gun without a holster. But it's unclear whether he had this thought before he asked defendant to put his hands up. And even if it was before, carrying a gun without a holster is an insufficient reason to suspect that criminal activity was afoot. The store video shows defendant talking to a store clerk about some stereo speakers when Lt. Hammer approached them, nothing else. Under the facts presented, Lt. Hammer did not have reason to suspect defendant of engaging in any criminal activity until after he ran a records check on the gun and defendant's criminal history. Only after Lt. Hammer heard the results did he begin to have a reasonable suspicion that defendant's possession of the gun may be illegal. Police should not assume an armed individual of being a felon or a person prohibited from carrying a gun by a court order. *United States v. Black*, 707 F.3d 531, 540 (4th Cir. 2013) ("Being a felon in possession of a firearm is not the default status. More importantly, where a state permits

individuals to openly carry firearms, the exercise of this right, without more, cannot justify an investigatory detention.").

The court certainly understands Lt. Hammer's reason for removing the gun before engaging in a discussion with defendant. But under the facts presented, Lt. Hammer's conduct was not reasonably related in scope to the circumstances. His failure to use less intrusive means to ensure his safety was unreasonable. The court finds the seizure of defendant was unreasonable under the Fourth Amendment and requires suppression of the evidence obtained through that seizure.

**IT IS THEREFORE ORDERED** that defendant's motion to suppress (Dkts. 27 and 32) is **GRANTED**.

**IT IS FURTHER ORDERED** that the government file a supplement to its response to defendant's motion to dismiss (Dkt. 26) within seven (7) days of the date of this Order.

**IT IS SO ORDERED** this 13th day of October, 2016.

                                                    s/  J. Thomas Marten
                                                    J. THOMAS MARTEN, Judge